# Fox v. McDonald.

*Application for Mandamus.*

1. *Construction of constitutional provisions.*—Constitutional provis‑
ions are to be expounded in the light of conditions existing at the
time of their adoption, in connection with former provisions and his‑
torical facts relating to the origin of our political institutions and the
practice under them.

2. *Distribution of powers.*—All powers which are, by the constitution
itself, expressly or by necessary implication, referred to the exclusive
exercise of one of the several departments of the government, must
be exercised by that department, and can not be, by legislation, con‑
ferred elsewhere.

3. *Nature of powers conferred not determinative of the department by
which they are to be exercised.*—The fact that certain powers and duties
conferred by legislation partake of a legislative, executive or judicial
nature, is not determinative of the department of the government by
which such powers and duties are to be exercised.

4. *Same.*—The constitutional provision in regard to the distribution
of the powers of government into three departments, and forbidding
the exercise by an officer of one department of any act properly be‑
longing to another, "was not intended to declare that every act per‑
taining to government, and the regulation of the social and property
rights of the citizen, should be exercised exclusively by the legisla‑
tive, executive, or judicial department, or some member of it, accord‑
ing as the act possessed a legislative, executive, or judicial char‑
acter."

5. *Power of appointment to office not inherently an executive function.*—
The power to appoint to office is not inherently an executive function ;
but by the policy of our government has been distributed among the
several departments of state.

[Fox v. McDonald.]

6. *Power of Governor to appoint to office.*—The Governor, as the chief executive, has no inherent right to appoint to office, and this function belongs to him only when conferred by statute.

7. *Constitutionality of the act to establish a board of police commissioners for the city of Birmingham.*—The act approved December 12, 1892, "To establish a board of commissioners of police for the city of Birmingham, Alabama," which confers upon the probate judge of Jefferson county, the county in which the city of Birmingham is situated, the power to appoint the commissioners, is not unconstitutional and void by reason of conferring upon a member of the judicial department the power of appointment.

8. *Legislative enactments presumed to be constitutional.*—Legislative enactments are always presumed to be in accord with the constitution, and will not be declared unconstitutional and void, unless it clearly appears that they offend some provision of the constitution.

9. *The act to establish a board of police commissioners of the city of Birmingham not unconstitutional, as denying to the city the right of local self-government.*—The act "To establish a board of commissioners of police for the city of Birmingham," which confers on the probate judge of Jefferson county the power to appoint the commissioners, but does not in express terms provide that the commissioners so appointed shall be residents of the city of Birmingham, is not unconstitutional because of such omission; the controlling purpose of the act being to provide an efficient enforcement of the police powers of Birmingham, and the intention that the commissioners to be appointed shall be residents of the said city being manifest on the face of the statute itself. (COLEMAN, J. concurring in the conclusion, but not in the reason therefor.)

10. *Legislative enactments; when they go into operation.*—Legislative enactments and their provisions go into immediate operation, unless by force of some general law, or some provision contained in the act itself, the operation is postponed; and the special provision fixing such postponement must be in terms so clear and certain as to admit of no other rational interpretation.

11. *Termination of the tenure of former officers upon appointment under a new statute.*—Under the act establishing the board of police commissioners for the city of Birmingham, which provided for the appointment of commissioners by the probate judge of Jefferson county on a certain day, the tenure of the several police officers serving at the time of the passage of said act terminated so soon as the police commissioners were appointed by the probate judge; their appointment necessarily annulling the power under which the former police officers held.

12. *Act not unconstitutional because the title fails to express the object to determine the terms of the police officers.*—The title of a legislative enactment as "An act to establish a board of commissioners of police for the city of Birmingham, Alabama," implies the insertion in the act of all powers reasonably necessary to the efficient

[Fox v. McDonald.]

administration of the police department of the city by the police to be appointed, which includes the power to appoint police officers; and the fact that this power to appoint is effected by cutting off the terms of the incumbents does not render the act unconstitutional, because that object is not expressed in the title; the title of the act being sufficiently comprehensive to include this result.

13. *Duty of the mayor of the city.*—It was the duty of the mayor of the city to take judicial notice of the appointment of the commissioners, their organization and selection of proper officers, when properly certified to by him; and he could not lawfully refuse to administer the oath of office to an officer appointed by the commission, which appointment was certified to him, nor had he the right to inquire into the regularity of said appointment.

14. *Ratification of appointment.*—There can be no ratification by the appointing power of the prior appointment of a public officer; but if the person has been informally appointed, or one duly appointed has failed to qualify, the appointing power can only fill the vacancy.

APPEAL from the City Court of Birmingham.

Heard before the Hon. H. A. SHARPE.

The proceedings in this case were instituted by a petition filed by the appellee, T. C. McDonald, in the city court of Birmingham, in which he prayed for a writ of *mandamus* to be issued to the appellant, David J. Fox, as mayor of the city of Birmingham, commanding him to administer to the petitioner the oath of office as chief of police for that city.

The act approved December 12, 1890, establishing a new charter for the city of Birmingham, provided in its 18th section that the board of mayor and aldermen should appoint the chief of police, and such other officers as they thought necessary for the enforcement of good government of the city, and that this board should have control over such officers. Section 19 of said act defined the powers of the chief of police of the city of Birmingham.

On February 19, 1890, the municipal council of Birmingham adopted a code of city ordinances. Section 46, chapter IV of said code, relating to the officers and their terms, provides that the chief of police, and other police officers, shall be elected annually by the board of mayor and aldermen, to serve at the will of said board for one year, or until their successors are elected and qualified, beginning on January 1st, of each and every year. Section 47 of the same chapter requires that the said officers shall be residents and qualified electors of

said city.  Section 48 requires that each of the officers named in section 46 "shall, before entering upon the discharge of their respective duties, and within five days after election, appear before the mayor and take and subscribe an oath well and truly to perform the duties of their respective offices to the best of their skill and ability."  Section 60 prescribes that the mayor "shall have the power, and it shall be his duty, to administer the oath of office to each of the officers of the city."  These several sections of the said code of the city of Birmingham were in force December 12, 1892, when "An act to establish a board of commissioners of police for Birmingham, Alabama," was approved and became a law. Acts 1892-93, p. 177.  This last act referred to consists of five sections.  Section 1 provides for the appointing of a board of commissioners of police for the city of Birmingham by the probate-judge of Jefferson county, consisting of five persons.  The first appointment to be made at the first regular meeting of the board of mayor and aldermen in the month of January, 1893, or immediately thereafter, and regulates the terms of officers appointed.  Section 2 provides for future appointments and for the filling of vacancies.  Section 3 prescribes the oath of office which the commissioners must take before entering upon the duties of the office, and directs that the oath shall be entered upon the minutes of the proceedings of the board, and the original filed in the office of the city clerk.  Section 4 prescribes the powers of the police commissioners, and is as follows: "That the board of police commissioners thus appointed and qualified shall have the exclusive power, and it shall be their duty, to appoint a chief of police and such other police officers and policemen as may be prescribed by city ordinance.  The salary of such officer and policeman to be prescribed by city ordinance, and shall not be increased or diminished during their respective terms. This power shall extend to unexpired as well as to regular terms.  They shall keep a record, and one of said board shall act as clerk thereof, keeping a complete record of all their proceedings.  They shall hold a stated meeting each month, and such other meetings as the public interest may from time to time require.  Three shall constitute a quorum, with power to transact business.  They shall exercise full directions and control of

the officers and members of the police force in conformity to existing laws and ordinances, and such as may be made in the future applicable to the subject." Section 5 relates to the removal of police officers or policemen from office by the board of commissioners.

It is shown by the record that on January 4, 1893, that being the first meeting of the mayor and aldermen [of Birmingham for that year, M. T. Porter, the probate judge of Jefferson county, appointed five police commissioners as required by the "Act to establish a board of commissioners of police for the city of Birmingham," who took the oath prescribed, and that the commissioners thus appointed met and organized. After the first appointment several vacancies occurred by resignation, but they were filled by the probate judge in accordance with the said act. On March 6, 1893, the board of commissioners of police elected the petitioner, T. C. McDonald, to the office of chief of police, at the same time electing other policemen. At the meeting of the board of police commissioners on March 30, 1893, there was adopted the following resolution : "Be it further resolved, that the president and secretary be and they are hereby instructed in the name of the commissioners to formally report to the mayor and aldermen of Birmingham on the first Wednesday night of April, 1893, that this commission, on March 6, 1893, elected the following officers and patrolmen for the city of Birmingham. Chief, T. C. McDonald, [and other officers]. The election of whom is hereby ratified and confirmed."

On April 1, 1893, the petitioner, T. C. McDonald, appeared before Mayor David J. Fox at his office, and offered to take the oath of office as required by section 48 of the city code, and to subscribe the same, and requested the said Fox, as such mayor, to administer the oath unto him ; but the mayor refused to do so ; whereupon the said McDonald filed the present petition praying for a writ of *mandamus*. In this petition the said petitioner averred the facts as above stated, and further averred that on March 31, 1893, he received from the board of commissioners of police a certificate of his election on March 6, 1893, as chief of police of Birmingham, and of the ratification and confirmation of his election on March 30, 1893, which certificate was signed by "J. P. Mudd, chairman," and "M. M. Boggan, sec-

retary," who were members of said commission, and who had been previously elected to their respective offices. The respondent demurred to the petition upon many grounds, which may be summarized as follows : (1.) That the petition shows that the petitioner did not apply to take the oath within five days after his election. (2.) That it does not appear from the petition that the respondent Fox had any legal notice of the defendant's election. (3.) It was not shown by the petition that the petitioner was duly elected chief of police on March 6, or that his election was ratified on March 30, or that the police commissioners had any authority to ratify it. (4.) It is not shown in the petition that there was any vacancy in the office of chief of police at the time of the alleged election or ratification. (5.) That the petition seeks to compel the performance by *mandamus* of an act requiring the exercise of judgment and discretion. (6.) That the act establishing the board of commissioners of police, under which the petitioner claims to have been elected, was unconstitutional because, (a.) the whole purpose of the act was not expressed in its title ; (b.) it was not competent to confer the power to appoint the board of police commissioners upon the probate judge ; (c.) the act confers upon the probate judge the power to remove from office incumbents, whose terms had not expired, without due process of law ; (d.) the act deprives the citizens of Birmingham of the right of local self-government. This demurrer was overruled by the court ; and thereupon the respondent filed his answer, in which he renewed with more detail the several objections raised by the demurrer ; and in addition thereto set up many facts to substantiate the following defenses : 1st. The denial of the election of the petitioner on March 6, 1893, and the ratification of his election on March 30, 1893. 2d. An attack upon the organization of the board of police commissioners. 3d. That McDonald had not executed bond, nor had the mayor and aldermen approved the same at the time of the demand and refusal averred in the petition. 4th. That the office was not vacant at the time of such demand, because S. H. Norton had, on December 9, 1892, been elected, under the then existing charter and ordinance, chief of police for the city of Birmingham for the year 1893. 5th. That the respondent was not legally and officially notified of the

organization of the board of police commissioners, and of the appointment of said T. C. McDonald as chief of police.

It is not deemed necessary to set out in detail the many other facts which are shown by the bill of exceptions. Upon the hearing of the cause, the judge of the city court granted the relief prayed for in the petition, ordered the *mandamus* to be issued to the respondent, David J. Fox, Mayor of Birmingham, Alabama, commanding him to administer to the petitioner, upon application, the oath of office as chief of police of the city of Birmingham. From this judgment the respondent appeals, and assigns as error the overruling of his demurrer to the petition, and the rendition of the judgment awarding the writ of *mandamus*, together with many rulings of the court upon the evidence, which, as stated above, are unnecessary to be stated in detail.

GREGG & THORNTON, BROOKS & BROOKS and JAMES E. HAWKINS for appellant.—(1.) In the absence of constitutional authority, the legislature can not confer power to remove an officer, other than by act of the legislature abolishing the office, and this is especially the case when the office has a fixed tenure.—*Cotton v. Ellis*, 7 Jones (N. C.) 545; *Dullam v. Willson*, 53 Mich. 392, s. c. 51 Am. Rep. 128; *State v. Wiltz*, 11 La. Ann. 439; *State v. Harrison*, 3 Am. St. Rep. 663, s. c. 113 Ind. 234; *Hill v. State of Alabama*, 1 Ala. 563. (2.) The legislature of the State of Alabama had no constitutional authority to pass the act providing for the establishment of the Board of Commissioners of Police for the city of Birmingham, Ala., and vest in the judge of probate of Jefferson county the power to appoint the commissioners, and make no provision that the commissioners should reside in said city; the passage of the act being an unlawful attempt to deprive the people of the city of Birmingham of local self-government.—Cooley's Cons. Lim. (4 Ed.), 44; *State of Indiana, ex rel Jameson v. Denny*, 4 Lawyers' Rep. Ann. 79; *The People v. Hurlbut*, 24 Mich. 44; *People ex rel Bolton v. Albertson*, 55 N. Y. 50; *Park Commissioners v. Common Council of Detroit*, 28 Mich. 228. (3.) If the act under consideration gives to the commissioners the power to appoint the chief of police and other police officers, in place of the chief of police and other police officers duly

elected by the board of mayor and aldermen of Birmingham before the approval of the said act of the legislature, it is unconstitutional, in that the subject of the act is not clearly expressed in the title.—*Ballentyne v. Wickersham*, 75 Ala. 533 ; *Brooks v. Hydorn*, 42 N.W. Rep. (Mich.) 1122. (4.) The act of the legislature, providing for the appointment of the Board of Police Commissioners, which elected appellee, is in violation of the constitution of Alabama, in that, it confers on the probate judge of Jefferson county, who belongs to the judicial department of the State, the power to appoint the police commissioners ; the power to appoint to office being intrinsically an executive act, and properly belongs to the executive department of the State.—Code (1886) Alabama, p. 25, Cons. Art. III, §§ 1 and 2 ; Code (1886) Alabama, p. 35, Cons., Art. VI, § 1 ; Acts of Alabama 1892–3, p. 177 ; *Case of Supervisors of Elections*, 114 Mass. 247 ; *State ex rel Jameson v. Denny*, 4 Lawyers' Rep. Ann. 79 ; *Burgoyne v. Board of Supervisors of the County of San Francisco*, 5 Cal. 19 ; *Exline v. Smith*, 5. Cal. 112 ; *Dickey v. Hurlbutt*, 5. Cal. 343 ; *Toulune County v. Stanislaus County*, 6 Cal. 440 ; *Phelan v. San Francisco*, 6 Cal. 531 ; *People v. Hester*, 6 Cal. 679 ; *People v. Eldorado County*, 8 Cal. 58 ; *Sanderson's Case*, 30 Cal. 160 ; *Taylor v. Commonwealth*, 3 J. J. Marsh. (Ky.) 401 ; *State v. Kennon*, 7 Ohio St. 561 ; *Achley's Case*, 4 Abb. Pr. 35 ; *State v. Barbour*, 53 Conn. 76, 55 Am. Rep. 65 ; *Marbury v. Madison*, 1 Cranch. 137. (5.) The police commissioners appointed by the judge of probate, under said act of the legislature, and the chief of police of Birmingham elected by said police commissioners, are State officers, and not mere agents of a municipal corporation.—Code (1886) Alabama, Vol. II, p. 124, § 4260 ; Acts of Alabama, 1890–91, p. 127, § 19 ; *Burch v. Hardwicke*, 32 Am. Rep. (Va.) 640, and many other cases therein cited ; *People v. Hurlbut*, 24 Mich. 44, s. c. 9 Am. Rep. 103 ; *Cobb v. City of Portland*, 55 Me. 381 ; *Buttrick v. City of Lowell*, 1 Allen, 172 ; *Williams Case*, 44 Ala. 41. (6.) The act of the legislature providing for the establishment of a Board of Police Commissioners for the city of Birmingham, Ala., is expressly within the inhibition of the constitution of the State ; but if the act is merely by implication within the inhibition of the constitution, it is the duty of the court to declare the law unconstitutional.—*Page v. Allen*,

[Fox v. McDonald.]

58 Pa. 338, 98 Am. Dec. 273; *People v. Gillson,* 109 N. Y. 389, 12 Cent. Rep. 616, 4 Am. St. Rep. 465; *Flint River Steam Boat Co. v. Foster,* 5. Ga. 194, 48 Am. Dec. 248; *Baily v. Phil. W. & R. R. Co.,* 4 Harr. (Del.) 389, 44 Am. Dec. 593; *Boston v. Cummins,* 6 Ga. 102, 60 Am. Dec. 717; *State of Indiana ex rel. Jameson v. Denny,* 4 Lawyers Rep. Ann., page 93; *Ballentyne v. Wickersham,* 75 Ala. 533; *Lane v. Kolb,* 92 Ala. 636, 9 So. Rep. 873. (7.) Even if the act to establish a board of commissioners of police be constitutional, and McDonald be entitled to have the oath of office administered, he was bound to exhibit to the mayor *prima facie* evidence that he had a clear title thereto free from doubt, of which the mayor was to judge; and it being a judicial act the decision of the mayor is not reversible on *mandamus* even though his decision be wrong. But in this case the evidence of title exhibited by McDonald to the mayor did not show that he had a clear title thereto free from doubt, but the facts before the mayor clearly show that Norton, the present incumbent of the office, was duly elected to the office by proper authority, that his title thereto was free from all reasonable doubt, and that the decision of the mayor was clearly correct. Furthermore, the act of the legislature, properly construed, confers no authority upon the police commission to remove Norton from office during the existence of his term, without cause, and without a hearing.—*Ex parte Harris,* 52 Ala. 87; *Cook v. Candee, Ib.* 109; *Thompson v. Holt, Ib.* 491; *Ex parte Thompson, Ib.* 98; *Ex parte Jones,* 94 Ala. 33, 10 So. Rep. 429; *Ramagnano v. Crook,* 88 Ala. 450, 7 So. Rep. 247; *Dunbar v. Frazer,* 78 Ala. 538; *Mobile Ins. Co. v. Cleveland,* 76 Ala. 321; *Hodgkinson's Case,* 5 N. Y. (Hill) 631–634; 4 Amer. & Eng. Encyc. of Law, p. 99, note 2; *U. S. v. Seaman,* 17 How. (U. S.) 225; *U. S. v. Guthrie,* 17 *Ib.* 284; *State v. Governor,* 22 Wis. 110.

CABANISS & WEAKLEY, *contra.*—(1.) Administration of official oath is a ministerial act, and *mandamus* will lie to compel proper officer to administer it.—*In re Heath,* 3. Hill. (N. Y.) 42; *People v. Straight,* (N. Y. App.) 28 N. E. Rep. 762; *People v. Dean,* 3 Wend. 438; *People v. Olds,* 3 Cal. 167, see page 175; *People v. Fletcher,* 2 Scammon (Ill.) 483; *Ex parte Winfield,* 3 Ad. & Ell. 614; 30 Eng. C. L. 285; *Groome v. Gwin,* 43 Md. 572; 8 U. S. Dig. N. S. p. 525, Sec. 22. (2.) Laws and ordi-

[Fox v. McDonald.]

nances stipulating that oaths of office be taken or official bonds be executed within some specified time are directory merely, and hence the failure of McDonald to offer to take the oath within five days from March 6, 1893, the day of his election, did not destroy his right to have it administered to him on April 1st.—*Kearney v. Andrews*, 2 Stockton (N. J.) 70; *State v. Lindley*, 10 Ohio 51; *Lantz v. People*, 113 Ill. 137; 1 Dill. Munic. Corp. Sec. 214; *Sprowl v. Lawrence*, 33 Ala. 674; *State v. Churchhill*, 41 Mo. 41; *State v. County Court*, 44 Mo. 230; *People v. Hully*, 12 Wend. 481. But if this were not so, the ratification of the election on March 30th was equivalent to a new election and the offer on April 1st, within five days, was in time according to the strictest possible rule. (3.) Under our system, all officers are oath bound, and the petitioner was required under existing ordinances to take the oath of office. These ordinances applied to him.—*Joseph v. Cawthorn* 74 Ala. 411. (4.) The police commission act is constitutional, and is not subject to any of the objections made to its validity. (a) The title is sufficient.—*Board of Rev. v. Barber*, 53 Ala. 589; *Montgomery B. & L. Asso. v. Robinson*, 69 Ala. 413; *Dillard v. Webb*, 55 Ala. 468. (b) The legislature has plenary power over public officers and offices. Office holders have no vested rights in their places.—*Lane v. Kolb*, 92 Ala. 636, 9 So. Rep. 973, and authorities cited; *Lang v. Mayor*, 81 N. Y. 425; *People v. Whitlock*, 92 N. Y. 190; *Ex parte Lusk*, 82 Ala. 519, 526,2 So. Rep. 140.(c) No clause of the constitution can be shown that guarantees to municipal corporations the right of local self-government.— *State v. Seary*, 35 N.W. Rep. (Neb.) 228; *State v. Bennett, Ib.* 235; *Dillard v. Webb*, 55 Ala. 468; *Board of Rev. v. Barber*, 53 Ala. 589. (d) The legislature has all the legislative power of the British Parliament, except as limited by the constitution.—*Morgan v. State*, 76 Ala. 60; *Davis v. State*, 68 Ala. 58; *Hare v. Kennerly*, 83 Ala. 608, 3 So. Rep. 683; *M. & A. of Birmingham v. Klein*, 89 Ala. 461, 7 So. Rep. 386; *Dorman v. State*, 34 Ala. 231. (5.) The power to appoint to office is not declared in the constitution to properly belong to the executive department, it is not inherently and essentially an executive function, in the sense that it can only be constitutionally performed by a member of the executive department of the State. The probate judge is not by the constitution

made a part of the judicial department; and it was com-
petent for the legislature to empower the probate judge
to appoint police commissioners for Birmingham.—*State
v. George*, 29 Pac. Rep. (Ore.) 356; s. c. 16 Lawyers Rep.
Ann. 737; *People v. Morgan*, 90 Ill. 562; *People v. Hoff-
man*, 116 Ill. 589; *Field v. People*, 2 Scammon (Ill.) 79;
*McArthur v. Nelson*, 81 Ky. 67; *Baltimore v. State*, 15
Md. 376; s. c. 74 Am. Dec. 572; 34 Cal. 520; *People v.
Freeman*, 80 Cal. 233; s. c. 22 Pac. Rep. 173; s. c. 13
Am. St. Rep. 122 and note; *State v. Seymour*, 35 N. J.
L. 54; *Santa v. State*, 2 Iowa 165; *State v. Kolsen*, (Ind.)
29 N. E. Rep. 595; *Walter v. Cincinnati*, 21 Ohio St. 1
and 14; *State v. Harmon*, 31 *Ib.*, 250; 1 Dill. Munic.
Corp. (4 Ed.), Sec. 60, p. 102; *Daley v. St. Paul*, 7 Minn.
396.   (6.) In doubtful cases statutes will not be declared
unconstitutional.—*Barb Wire Co. v. Brown*, 64 Iowa 275;
*Baltimore v. State*, 74 Am. Dec. and note p. 595; *Louis-
ville R. R. Co. v. Davidson*, 62 Am. Dec. 424. (7.) Contem-
poraneous construction of  constitution and its sanction
by subsequent legislative acts will be followed.—*Bruce v.
Schuyler*, 46 Amer. Dec. 447; *Nichols v. Bridgeport*, 60
*Ib.* 636.   (8.) It was the duty of the Mayor to obey the
law, not to question its validity.—*State v. Shakespeare*,
(La.) 6 So. Rep. 592; *People v. Salomon*, 54 Ill. 39; *Hoke
v. Field*, 10 Bush. (Ky.) 144.   (9.) The police commis-
sion act vested in the commissioners the power and im-
posed the duty of electing a chief of police for Birming-
ham, and when they elected petitioner the then incum-
bent's rights ended.—*Ex parte Wiley*, 54 Ala. 226; *Reynolds
v. McAfee*, 44 Ala. 237; *Ex parte Lusk*, 82 Ala. 519, 2 So.
Rep. 140; *Keenan v. Perry*, 24 Texas 253.   (10.) The
appointees of the mayor and aldermen held at the will
of the board.   When the power of that body was trans-
ferred to another body by the police commission act,
their appointments terminated.—Mechem on Agency, §
270; *State v. Board*, 7 Neb. 42.   (11.) This is not a peti-
tion to induct McDonald into office, but to require of
defendant the performance of a ministerial duty attach-
ing to his office.   *Mandamus* is the appropriate remedy,
and there is nothing in the incumbency of Norton, as
shown in the record, to defeat petitioner in the remedy
selected.—*State v. Ely*, 43 Ala. 568, 576; *State v. Plam-
beck*, (Neb.) 54 N. W. Rep. 667; *Beck v. Jackson*, 43 Mo.
117; *People v. Fletcher*, 2 Scammon (Ill.) 483; *Cope v.

*State*, 25 N. E. Rep. (Ind.) 866 ; *State v. Saxon*, 6 So. Rep. (Fla.) 858 ; *Driscoll v. Jones*, 44 N. W. Rep. 726 ; *People v. Olds*, 3 Cal. 167, 175 ; *Ex parte Strong*, 24 Pick. 484 ; *State v. County Court*, 44 Mo. 230 ; High Ext. Leg. Rem. Sec. 52, p. 57 ; *Gulick v. New*, 77 Am. Dec. 49 ; *Delgado & Chavez* 34 Am. & Eng. Corp. Cases, 334 ; *The King v. Morgan Rice*, 5 Modern 325 ; *Ex parte Lusk*, 82 Ala. 519, 2 So. Rep. 140 ; *Lane v. Kolb*, 92 Ala. 636, 9 So. Rep. 873 ; *People v. Head*, 25 Ill. 325 ; *People v. Kilduff*, 16 Ill. 493 ; 75 Ill. 186. (12.) *Mandamus* will lie when relief can not be procured by *quo warranto.*—*Lewis v. Whittle*, (Va.) 5 Amer. & Eng. Corp. Cases, 271 ; *In re Strong*, 20 Pick. (Mass.) 495.

HEAD, J.—On December 12, 1892, the General Assembly passed "An act to establish a Board of Commissioners of Police for the City of Birmingham, Alabama;" which act provides for the appointment, by the probate judge in and for Jefferson county, of a board of commissioners of police for said city, consisting of five persons, and defines its powers and duties, among which are to appoint a chief of police and such other police officers and policemen as is or may be prescribed by city ordinance, and to exercise full direction and control of the officers and members of the police force in conformity to existing and future laws and ordinances on the subject. Accordingly, the probate judge appointed five persons who entered upon the duties of their offices, and, as a board, appointed T. C. McDonald to the office of Chief of Police, who thereafter presented himself to David J. Fox, the mayor of the city, for qualification, and demanded that the oath of office be administered to him ; it being the duty of the mayor, under city ordinance, to administer the oaths of office to the officers of police. Fox declined to administer the oath, and McDonald applied to the city court of Birmingham for the writ of *mandamus* compelling him to do so. From an order of the court granting the peremptory writ, Fox appealed to this court.

This act is assailed by the appellant as unconstitutional, on several grounds. We will notice first, the chief contention, that it offends sections 1 and 2 of Article III of the constitution. These are as follows : "Article III. Distribution of Powers of Government. § 1. The pow-

ers of the government of the State of Alabama shall be
divided into three distinct departments, each of which
shall be confided to a separate body of magistracy, to-
wit : Those which are legislative, to one ; those which
are executive, to another ; and those which are judicial,
to another.  § 2.  No person, or collection of persons,
being of one of those departments, shall exercise any
power properly belonging to either of the others, except
in the instances hereinafter expressly directed or per-
mitted."   It is contended that the act in question is vio-
lative of these provisions for the reason, that the probate
judge, upon whom the power of appointing the commis-
sioners is conferred, is of the judicial department of the
State government, while this power of appointment so
conferred upon him properly belongs to the executive
department, within the meaning of the constitutional
provisions quoted.

   To solve the question thus presented, we must learn
what these provisions mean.   Noticing them analytically,
we observe, first, that the general purpose of the article
is the distribution of the *powers of the government of the
State* ; and to that end, it is declared first, that those
*powers* shall be divided into three distinct "*departments*" ;
secondly, that each of these "*departments*" shall be con-
fided to a separate "*body of magistracy*," to-wit, those
powers which are legislative, to one ; those which are
executive to another ; and those which are judicial to
another ; and, thirdly, that no person, or collection of
persons, being of one of those "*departments*" shall exer-
cise any power properly belonging to either of the others,
except in the instances expressly directed or permitted.
Thus we see that the *powers* of government distributed
are those which are divided into the three *departments*,
and, by these three divisions or departments, confided
to separate bodies of magistracy.   First, then, what are
we to understand by the terms "departments" and "body
of magistracy," as they are here used?   How are these
bodies of magistracy to whom these powers are to be
confided to be created and made known?   Of whom or
what shall they consist?   We get definite and complete
information upon this subject from the three succeeding
articles of the constitution itself, viz.: "Article IV.
LEGISLATIVE DEPARTMENT. § 1.  The legislative power of
this State shall be vested in a general assembly, which

shall consist of a senate and house of representatives."
"Article V. EXECUTIVE DEPARTMENT. § 1. The executive
department shall consist of a governor, secretary of state,
state treasurer, state auditor, attorney general and su-
perintendent of education, and a sheriff for each county.
§ 2.   The supreme executive power of this State shall
be vested in a chief magistrate who shall be styled The
Governor of the State of Alabama." "Article VI. JU-
DICIAL DEPARTMENT. § 1. The judicial power of the State
shall be vested in the senate, sitting as a court of im-
peachment, a supreme court, circuit courts, courts of
probate, such inferior courts of law and equity, to con-
sist of not more than five members, as the general as-
sembly may from time to time establish, and such per-
sons as may be by law invested with powers of a judicial
nature."

The term "departments," it will be observed, is first
used to denote the three parts or divisions into which
the powers of government are to be divided; but in the
context it is used interchangeably with the term "body
of magistracy," to denote the governing bodies to which
the powers of government are respectively confided.
Here then, we have a department or body of magistracy,
consisting of a senate and house of representatives to
which is confided the legislative power; a department
or body of magistracy consisting of a governor, secretary
of state, state treasurer, state auditor, attorney general
and superintendent of education, and a sheriff for each
county, to which is confided the executive power, the
supreme executive power being vested in the governor;
and a department, or body of magistracy, consisting of
the senate, sitting as a court of impeachment, supreme
court, circuit courts, courts of probate, such inferior
courts of law and equity, to consist of not more than five
members, as the general assembly may from time to time
establish, and such persons as may be by law invested
with powers of a judicial nature, to which is confided the
judicial power, intended by the constitution to be dis-
tributed.   When we speak, therefore, of the legislative
department let us be understood to mean, as the consti-
tution intends, the senate and house of representatives;
of the executive department, the governor and other offi-
cers above named with him; and of the judicial depart-
ment, the senate sitting as a court of impeachment, the

[Fox v. McDonald.]

courts and so forth, above named, as constituting that department. Keeping these definitions in view, we can the better determine the vital question arising upon the contention now under discussion in this cause, which is, what powers of government does the constitution intend shall be confided to the exercise, respectively, of these several governing bodies? Now, it must be conceded that the powers thus vested in these several departments are intended to be committed to their *exclusive* exercise; and this, independently of the provision that no person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others. Thus, for instance, the legislative power intended to be vested in the General Assembly can not be delegated to any other body, whether such body be of either the other defined departments or not, but must be exercised exclusively by the General Assembly itself. So also, an executive power intended to be vested in the executive department, can not, by legislation, be vested in any other person or body, whether such person or body be of either of the other departments or not. For instance, the pardoning power, or the power to fill vacancies in certain specified offices, being, by the constitution, vested in the Governor, can not, by legislation, be transferred to another, but must be exercised by the Governor exclusively. As this is so, in reference to acts expressly confided to a particular department, so also must it be true with reference to acts which, by construction or implication, are confided to that department. To repeat, all acts, expressly or impliedly, assigned to a department by the constitution must be performed by that department, and the power to perform them can not be conferred elsewhere. Cooley on Con. Lim., marg. p. 115.

We return then to the question : What powers does the constitution intend shall be thus confided to the exclusive exercise, respectively, of these several governing bodies? The insistence in argument of counsel for appellant, or that to which it leads, is, that, except in cases otherwise provided by the constitution itself, every act *which is legislative in its nature* and which pertains to, or in any wise affects, the government of the citizen, or which controls and regulates the conduct of citizens in their mutual intercourse, wheresoever, within the State, such govern-

[Fox v. McDonald.]

ment or control is to be accomplished, and for whatsoever purpose such accomplishment is intended, must be exercised by the state legislative department; that all acts which are of a *judicial nature*, affecting the government of the citizen, or pertaining to the enjoyment, enforcement or administration of the laws of the land, must be exercised by the state judicial department, or some member of it; and likewise, that all such acts which are of an *executive nature* must be exercised by the state executive department, or one of the designated officers composing it. The argument is that the *nature of the act* to be performed must, in every instance, determine the question; and that nature being found to be legislative, executive or judicial, the performance of the act must be assigned to the appropriate state department. We are quite clear the contention takes a step too far. Now, it is certain that all powers which are, by the constitution itself, expressly or by necessary implication, referred to the exclusive exercise of these departments must be so exercised. There are many such provisions, but none of them provide for the appointment of officers of the kind here involved created by legislative enactment. All other powers, not expressly designated in the constitution itself, intended to be confided to the exclusive exercise of the departments thereby created, must be ascertained by construction. It is a well settled principle that constitutions, like statutes, are properly to be expounded in the light of conditions existing at the time of their adoption; and we look at the antecedent government, consider its system, as a whole and in its several parts, and the experiences and practices of its administration; and we consider and weigh the evils of the old system which the people intended to cure by the new. Thus aided, we interpret those provisions which require construction, and determine what the intention of the framers of the instrument was, and give effect to that intention; and it not infrequently occurs, in the exposition of written laws, both constitutional and statutory, that the letter of a provision will be justly made to yield to a manifest intention in opposition to it, derived by construction alone. When we take our constitution, therefore, and read it in the light of this history, we see plainly that it was not intended to declare that every act pertaining to government and the regulation of the social

[Fox v. McDonald.]

and property rights of the citizen, should be exercised
exclusively by the legislative, executive or judicial de-
partment of the state government, or some member of
it, according as the act possessed a legislative, executive
or judicial character; for we find there are many such
acts especially peculiar to the very nature of our system,
and necessarily inherent in it, which, time out of mind,
have not been exclusively exercised by these depart-
ments, and which, for the ease and efficiency of our sys-
tem, could not be so exercised./ For illustration, confine
literally all power of a legislative nature to the General
Assembly, and we strike down, at once, all governments
of towns and cities, by and through municipal corpora-
tions, whose very existence and efficiency depend upon
the legislative, executive and judicial powers with which,
by their nature, they must be clothed, and which they
have ever, under the legislative authority of the State
alone, been accustomed to exercise.   In the light of long
established usage and experience, we construe the con-
stitution and determine that its framers never intended to
interfere with the right of municipal corporations, under
legislative sanction, to exercise these functions of govern-
ment.   It is true, that under the present constitution, it
may be said that the right to create municipal govern-
ments with their usual powers, is recognized or provided
for, but with the same provisions distributing the powers
of government as those now in force, contained in the
constitutions of 1819, 1861 and 1865, and with no men-
tion in those instruments of authority in the General
Assembly to create municipal corporations, the General
Assembly, from 1819 to the present time, has exercised
that authority, and the corporations so created have ex-
ercised   the   powers   so   conferred,   without   objec-
tion or  suggestion  from  any  source that such exer-
cise was   not  within  constitutional  authority, on the
assumption that all legislative, executive and judicial
power was, by the constitution, confided to certain other
designated bodies of magistracy.   When we read upon
this subject, we find the books teach us that the spirit of
localized government, by local territorial sub-divisions,
carried on through subordinate governmental agencies,
found early root and growth in the notions of English
liberty and polity; and we are told that from an imme-
morial or early period the local territorial sub-divisions

of England, such as shires, towns and parishes, enjoyed a degree of freedom, and were permitted to assess upon themselves their local burdens and to manage their local affairs ; and Judge Dillon declares that our ancestors, in the settlement of this country, brought these notions with them, and that they found here a field of unexampled extent for their free development. Accordingly, he says, the system of intrusting the direction of local affairs to the local constituencies, had from the earliest colonial periods been carried on by us to a much greater extent than in England ; and, he observes, as you pass from one end of this country to the other, alike in the oldest regions and in the newest organized settlements, you find the affairs of each road district, school district, township, county, town and city locally self-managed, including the administration of local justice. This policy of creating local police and municipal corporations, he declares, is exhibited in all our legislation, and expressly or impliedly guaranteed in our State constitutions. And Judge Cooley, speaking of the powers of legislation commonly bestowed upon municipal corporations, says, that such bestowal is not to be considered as trenching upon the maxim that legislative power must not be delegated, since that maxim is to be understood in the light of the immemorial practice of this country and of England, which has always recognized the propriety and policy of vesting in the municipal organizations certain powers of local regulation, in respect to which the parties immediately interested may fairly be supposed more competent to judge of their needs than any central authority. Cooley on Con. Lim., marg. p. 118. The conventions which framed our several constitutions, therefore, had no need to expressly reserve to municipal corporations the legislative, executive and judicial power, so long wont to be exercised by them, when, in the distribution of the powers of the government of the State, they declared that the legislative, executive and judicial power should be confided to the respective departments or bodies of magistracy by them created and defined. The reservation arose by implication out of the existing order of things. Again : if all functions of government of a legislative, excutive, or judicial character properly belong to, and are, therefore, to be exercised exclusively by, the several departments created by the constitution, what shall

become of the multiform powers and duties, which by legislative enactment, without express constitutional authority, have so long been conferred upon, and exercised by, the various officers appointed to perform functions of government in the several counties, and who are not made members of either of those departments? Has it ever been thought that the executive and ministerial, and indeed, in some instances, the judicial, or *quasi* judicial functions of the tax assessor, tax collector, county treasurer, coroner, county surveyor and clerks of courts, to which may be added the officers and boards of control of our State institutions for the care of the insane and deaf, dumb and blind, and our State and county medical boards, for the preservation of the public health, properly belong to the several State bodies of magistracy created by the constitution, within the spirit and intent of that instrument, and must, therefore, be confided to the exclusive exercise of those bodies? None will so declare. Indeed, we have in our system, in opposition to the letter of the constitutional provisions under review, striking illustrations of the blending of legislative, executive and judicial power in the same persons or bodies, which it has not been, and will not be, supposed our several constitutions intended to inhibit. In Clay's Digest, and in each compilation of our laws since, we find the creation of a court of county commissioners. This body is an inferior court created by law, and belongs, under express provision of each of our constitutions, to the judicial department of government; yet, we find, in its very creation, it was, and has ever since been, endowed with legislative and executive powers. In fact, its chief duties are of those characters. It is given the power to levy and assess taxes for the support of the county government, which is a legislative function. Cooley on Con. Lim., marg. pp. 479, 488. It is given power to direct and control the property of the county; to examine and audit the accounts of the receiving and disbursing officers of the county; to make rules and regulations for the support of the poor; and it is given plenary and executive powers over the erection and maintenance of public roads, bridges and ferries and the appointment of the necessary officers in that behalf. These are functions which do not inherently pertain to the judiciary, yet none will say, in view of their long

[Fox v. McDonald.]

continued and useful exercise by the court of county commissioners, without let or hindrance, that the constitution, in distributing the powers of government, intended to inhibit such exercise. So, also, the sheriff who is expressly made a member of the executive department, has ever been empowered, by legislation, to perform the judicial function of approving bonds necessary to be taken by him in the administration of the laws. Clerks, registers in chancery, commercial notaries and commissioners of deeds, under constitutions in terms confining judicial power to the courts, have long exercised, under legislative sanction only, the power of taking acknowledgments of conveyances, which this court has declared to be of a judicial nature. The coroner is so far an executive officer that he may execute process upon, and arrest the sheriff himself, who is, by the terms of the constitution, a member of the state executive department, and yet it has never been supposed that he may not, with constitutional favor, perform the judicial function of holding inquests. Other illustrations might be given, but these suffice to make clear the principle that the constitution must receive an enlarged and liberal interpretation, and the intention of its framers ascertained upon a broad view of the history and experience, the needs and usages of the time, and the great general purpose they had in view of framing a comprehensive and beneficent government. Thus viewed, we irresistibly conclude that it was not the intention of the constitution to declare that all these powers and duties, so indispensable to efficient government, and so long exercised, under legislative sanction only, by these officers and agencies of legislative creation, properly belong to the legislative, executive or judicial body of magistracy created by the constitution, because alone they may partake of a legislative, executive or judicial nature.

We come then to the concrete question : Does the power to fill vacancies in office by appointment *"properly belong"* to the executive department of the State government, to be exercised exclusively by that department, within the meaning of the constitution? It may be regarded as a fundamental policy of our system of State governments in this country that the selection of persons to perform the offices and functions of government shall be left to the people themselves to be exercised at

the ballot box. Indeed the right and attribute of the people in respect of the selection of their own officers, by methods which they may prescribe in their written constitutions and laws, are so firmly fixed in our institutions that the people themselves could not throw them off, to the extent of destroying our republican forms of government, for the people of the States have confided to the central government of the United States the power and duty to guarantee to every State in the union a government republican in form. Section 4, Art. IV, Cons. U. S. The inherent nature and essence of the act of selecting officers of government, therefore, in view of this established policy, describe it as one properly belonging to the people, through the ballot, and not to any particular department of government to be exercised by representatives of the people. The filling of vacancies in office pending the action of the people, by appointment of their representatives clothed by law with that authority, is, as a rule, an expedient merely, evoked by the convenience and necessities of government, growing out of the nature of our system. In the nature of things, the people can not be always called upon to act immediately when the selection of a person is necessary to the exercise of a function of government; hence, it has been customary and essential to provide other means of appointment in cases to which this necessity gives rise. Furthermore, in our experience, wisdom has dictated that particular offices be filled exclusively by appointment of some governmental agency other than the vote of the people themselves, and this, and the agencies for such appointments, and the methods of filling vacancies in offices elective by the people, have been expressly manifested and prescribed in our constitutions or laws. It was necessary that they be so prescribed, for otherwise the right of such appointment resided nowhere; it belonged to no department of the government. With us, the Governor has no prerogatives. He must find warrant in the written law for his every official act. He has no more power to appoint officers, when not expressly conferred, than has the president of the senate, who is of the legislative, or the chief justice of this court, who is of the judicial department; and when we go back to our constitution and laws in this State, from the beginning of the State government to the present,

we find it has been the policy to distribute this appointing power among the several departments of the State. We need not specify. The instances will readily occur to the minds of those familiar with the constitutions and laws. It may be true, that the Governor has been invested with the greatest share of this power, but no principle or policy has been declared that the power inherently belongs to him. And we may remark that the fact that all our constitutions, in assigning appointive power to the Governor, have specifically designated the particular officers to whom it applied, furnishes cogent argument that the people did not regard the power as necessarily or inherently belonging to him.

In what we have said we have pretermitted inquiry whether or not the act of appointing an officer is inherently of an executive character; and we have endeavored to show that whether so or not, it is not such an act as, upon a proper construction of the constitution, properly belongs to the executive department. The weight of authority joins issue upon the proposition that it is inherently of that character. The supreme court of California declares it possesses judicial characteristics. Says that court: "The person to be appointed is required to have certain qualifications. He must be a citizen of the United States and of the State, and a resident and qualified voter of the city and county, and he must be of good repute for honesty and sobriety, and he is required to produce evidence to this effect. * * * * The examination of these questions, passing upon the sufficiency of the evidence, and determining whether the candidates possess the requisite qualifications, are certainly functions partaking essentially of a judicial character."—*People v. Provinces*, 34 Cal. 520. In *People v. Morgan*, 90 Ill., on p. 562, it is said: "The executive power in a State is understood to be that power wherever lodged, which compels the laws to be enforced and obeyed. And the instrumentalities employed for that purpose are officers elected or appointed, who are charged with the enforcement of the laws. But the power to appoint is by no means an executive function unless made so by the organic law or legislative enactment." In *Mayor of Baltimore v. State*, 15 Md. 376, it is said: "We are not prepared to admit that the power of appointment to office is a function intrinsically executive, in the sense in which we under-

stand the position to have been taken; namely, that it is inherent in, and necessarily belongs to, the executive department. Under some forms of government, it may be so regarded, but the reason does not apply to our system of checks and balances in the distribution of powers where the people are the source and fountain of government, exerting their will after the manner, and by instrumentalities specially provided in the constitution.''

In *People v. Freeman*, 80 Cal. 233, that court again held that the power of appointment to office is not essentially an executive function, and may be regulated by law. Judge Christiancy in *People v. Hurlbut*, 24 Mich. 44, had under consideration whether the legislature could appoint persons to fill offices created by it; and his purpose was to determine whether such appointment could be treated as a legislative act which it was competent for the legislature to perform; and in discussing the question he says: "Besides the power to make general rules for the government of officers and persons, and regulating the rights and classes of persons or of the whole community, there is a large class of powers recognized as legislative, occupying an intermediate space between those of a judicial character on the one side, and the executive on the other, and which are not, and can not be, marked off from these by any clear line;" and further on he says: "As to this mode of appointment, being the exercise of a power essentially executive in its nature, it is sufficient to say that executive power can not always be defined by any fixed standard in the abstract. What would come within the executive power in our form of government, would fall within the legislative in another, and *vice versa*. The question here is whether, under our constitution, it is executive or legislative; and as the constitution has not confided the appointment of those or of the like officers to the executive authorities, and has left it to the legislative discretion, whether to create such offices, and how they shall be filled, it can not be truly said that such an appointment is any more in the nature of the exercise of an executive than a legislative power." In harmony with these decisions see *State v. Constantine*, 42 Ohio St. 441; *People v. Woodruff*, 32 N. Y. 364. There are decisions to the contrary.—*Taylor v. Commonwealth*, 3 J. J. Marsh. 401; *State v. Kennon*, 7 Ohio St. 561; *Achley's Case*, 4 Abb. Pr. 35;

*State v. Noble*, 118 Ind. 350, and other cases from that State. These Indiana cases give the question full discussion, and they appear to be the only well considered cases in support of their doctrine. Mr. Freeman, in an exhaustive note in 13 Amer. St. Rep., on p. 125, reviews all the authorities upon this subject, and states his conclusion from them in the following language: ''The truth is, that the power of appointing or electing to office does not necessarily and ordinarily belong to either the legislative, the executive or the judicial department. It is commonly exercised by the people, but the legislature may, as the law making power, when not restrained by the constitution, provide for its exercise by either department of the government, or by any person or association of persons whom it may choose to designate for that purpose. It is an executive function when the law has committed it to the executive, a legislative function when the law has committed it to the legislative, and a judicial function, or at least a function of a judge, when the law has committed it to any member or members of the judiciary.'' What he has said meets with our approval.

It is again objected that the act is unconstitutional in that it denies to the city the right of local self-government. This contention is based on the power given the probate judge to appoint the commissioners, and upon the further assumption that the act empowers him to appoint persons who are not members of the municipality, who do not reside within the city. There is no force in the objection so far as concerns the designation of the probate judge as the appointing power. We have reached the conclusion that the probate judge may lawfully appoint the commissioners. With that act his duties end. He takes no part in administering the city government. The case is exactly the same as if the appointing power had been conferred upon the Governor, instead of the judge of probate, and we apprehend it would not be contended in that case, that the local government of the city was for that reason interfered with. The persons appointed commissioners exercise the functions of government conferred upon them by the act, and not the person who appoints them. But the other proposition may deserve more serious consideration. Upon mature reflection, we do not deem it necessary to decide what the effect upon the act would be, in respect of its constitution-

ality, if the construction of the act thus assumed be the correct one ; for, we reach the conclusion that it was not the intention of the legislature to authorize the appointment of persons who are not members of the municipal corporation for whose use the means of local government were, in part, being provided. The act is not carefully drawn. It is noticeable for the meagreness of its provisions, as well as the indefiniteness of some of those which are inserted. With this character, it is before us for construction. It is an act which relates alone to the local government of the city of Birmingham. Its controlling purpose, as all must know, was to provide an efficient enforcement of the police powers of the city. To this end, the legislature knew and intended that the commissioners to be appointed should be persons familiar with the govermental affairs of the city and the needs and wants of its police system, and who should be identified with the city's interest. The commissioners are required to exercise full direction and control of the officers and members of the police force. They are required to hold meetings at all times when the public interest of the city may require. They are required to exercise constant supervision of the conduct of the police officers and to prefer accusations against them for wrongs and delinquencies committed by them which would justify their suspension or removal. These duties, which manifest themselves as the moving causes of the enactment, unmistakably imply necessity for the appointment of persons resident in the city and interested in its welfare, and their constant presence therein, without which their duties could not be well performed. Suppose the probate judge had appointed residents of the county of Mobile, for instance, to manage the police affairs of the city of Birmingham, would any one suppose, or could it be legitimately contended, that the legislature intended by this act to confer any such authority? The answer would at once be, No! that the intention was that citizens of the municipality, to be affected by the legislation, be selected to perform these duties. Suppose, again, the legislature should create an office for the exercise of some State governmental function, and provide that the person to fill it should be appointed by the Governor, without providing that he should be a resident of the State, could it be contended that the Governor was em-

powered to appoint a resident of another State? and would the act be declared unconstitutional upon the assumption that, for that reason, it infringed local self government? We apprehend it would be at once construed that the Governor must appoint a resident of this State. Legislative enactments are always presumed to be of constitutional authority. It must clearly appear that they offend some provision of the constitution before the courts are authorized to set them aside. If a construction may be fairly indulged which will wrest them from the attack of giving offense to a constitutional limitation, that presumption shall be indulged. We are, therefore, of the opinion that the failure of the act to provide in express terms that the commissioners shall be residents of the city is due to legislative oversight, which is supplied by the general intention of the legislature that they shall be such, manifest upon the face of the act itself.

It is again objected that the act is unconstitutional because, by its provisions, the terms of the present police officers are cut off, when that object is not expressed in the title. This contention may fairly raise the question whether, upon a proper construction of the act, the tenures of the present incumbents were cut off; but whether so or not, the parties have joined in a request that we construe the act and announce our opinion upon that question.

It is a principle self evident, as well as declared in all the authorities upon the subject, that legislative enactments, and each and every provision therein, go into immediate operation, unless by force of some general law, or provision contained in the act itself, the operation is postponed to some future period or event; and the special provision which would create such postponement must be stated in express words to that effect, or in terms so clear and certain as to admit of no other rational interpretation. The principle of this strictness results from the obvious necessity that all men should know with certainty when our laws take effect.—*Lane v. Kolb*, 92 Ala. 636, 9 So. Rep. 873, and cases cited. Applying this rule to the act in question, and it can not admit of doubt that the act went into effect at least as early as the day of the first regular meeting of the Mayor and Aldermen of Birmingham, in January, 1893—the time fixed in the act for

the appointment of the commissioners.· There are no provisions which show, with the degree of certainty the rule requires, an intention to further postpone its operation. This is true, not only with respect to the act as a whole, but to each and every provision thereof. The result is, that the power of the commissioners to appoint the police officers immediately arose, and all authority of the Mayor and Aldermen over their appointment and retention in office ceased. The persons in office being in by virtue of the appointive power of the Mayor and Aldermen, the abrogation or withdrawal of that power, and the substitution of a new appointive power in another body, necessarily, *ipso facto*, annulled the tenures of their appointees, there being nothing in the act retaining them in office.—*Lane v. Kolb, supra; State ex rel v. Board*, 7 Neb. 42. The rule is analogous to that which obtains in reference to agency. When the authority of an agent, who is empowered to appoint sub-agents, is revoked by the principal, the authority of all existing sub-agents, so appointed, is likewise revoked.—Mechem on Agency, § 270. These principles are so undeniable that it is unnecessary to do more than state them. The conclusion here reached does not determine that the act is unconstitutional upon the ground alleged that the purpose to accomplish such a result is not clearly expressed in its title. The title is, "An act to establish a board of commissioners of police for the city of Birmingham, Alabama." This implies the insertion in the act of all powers reasonably necessary to an efficient administration of the police department of the city by commissioners, which obviously includes power in the commissioners to appoint police officers. Such power, as we have already shown, has the effect, in itself, of cutting off the terms of incumbents. It follows, logically, from these unassailable propositions, that the title of the act was sufficiently comprehensive in the particular in question.—*Board of Revenue v. Barber*, 53 Ala. 589.

The next question arising is,· What was the mayor's duty when McDonald presented himself for qualification? . This record shows that it does not admit of serious question that the mayor had most ample notice and knowledge, official and personal, of McDonald's appointment. It was competent and necessary for the commissioners to organize for systematic work, by electing a presiding and

[Fox v. McDonald.]

a clerical officer. They did so by electing a chairman and secretary. The act says they must appoint a "clerk." This they did by appointing a person charged with the duties of a clerk. That they designated him by the synonymous title of secretary is wholly immaterial. The duties of the officer were the same, whether you call him clerk or secretary, and the nature of those duties is clearly implied in either designation. The law regards the substance, not the forms of things. The mayor of the city, as a principle of law, was bound to take official notice of the appointment of the commissioners, and of the necessary officers of their board by them elected. He knew, therefore, that Mudd was chairman and Boggan secretary or clerk. These officers duly certified to him McDonald's appointment. Besides, the proof is most abundant that the mayor personally knew all the facts, and made no pretense that he did not, but based his refusal to act either upon the assumed unconstitutionality of the act, or the mistaken conception that the tenures of those in office were not cut off. The trial of the title to the office was not within his jurisdiction. That must have been left to other tribunals. It was enough for him that McDonald presented a *prima facie* showing of his appointment emanating from the appointing power. This was done, and the oath of office should have been administered. There is clearly no merit in the suggestion that five days from McDonald's appointment had expired when he presented himself, for he had been re-appointed within the five days. It is said there was no re-appointment, but a *ratification* merely of the original appointment, which, upon the principles of the law of ratification, had relation to the time of the appointment ratified. This is a mistaken view. There is no such principle as the ratification by the appointing power of the prior appointment of a public officer. If a person has been informally appointed and has done official acts under it, or if he has acted without qualification, his acts are validated by law as those of an officer *de facto*, and no intent of *ratification* by the appointing power could add anything to their validity. So also, if a person duly appointed fails to qualify, within the time prescribed by law, and thereby forfeits his right, a vacancy arises which the appointing power may fill. His failure to qualify can not be "*ratified.*" The appointing power can only fill the

[Bibb v. Hall and Farley.]

vacancy. Though the action of the commissioners, in the present instance, was put in the form of a ratification, its necessary legal effect was that of a reappointment. It was a clear act of the commissioners manifesting that thenceforth McDonald should be chief of police, and this was duly certified to the corporate authorities. Nothing more was necessary to constitute an appointment.

The act required to be performed by the mayor was purely ministerial. There was no other adequate remedy to secure the right than *mandamus*. The city court properly granted the writ, and its judgment is affirmed.